1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**LINKS: 52, 55, 58**

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

SUMMIT ENTERTAINMENT, LLC,

           Plaintiff,

      v.

B.B. DAKOTA, INC. et al.,

           Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Case No. CV 10-04328 GAF (RZx)**

MEMORANDUM & ORDER REGARDING
MOTIONS FOR SUMMARY JUDGMENT BY
PLAINTIFF SUMMIT ENTERTAINMENT,
LLC AND DEFENDANT B.B. DAKOTA, INC.

AND RELATED COUNTERCLAIM )

**I.**

**INTRODUCTION**

      Between 2006 and 2008, Defendant B.B. Dakota, Inc. ("BB"), a women's

clothing manufacturer, marketed a women's cargo jacket that it named the "Leigh"

jacket.  After it was discontinued in 2008, it was given a new lease on its commercial

life when it was worn by the Bella Swan character in "Twilight," which was released in

late 2008.  According to Plaintiff Summit Entertainment, LLC ("Summit"), which

produced and distributed the movie, BB renewed production of the jacket and initiated a

marketing blitz that misappropriated Summit's trademarks and copyrighted imagery.

Summit brings this lawsuit to preclude these violations and to recover damages for

trademark and copyright infringement.  BB concedes that it used the intellectual property at issue, but contends that a cursory e-mail exchange between its outside public relations contractor and Summit's manager of national publicity created a license between the parties and constituted consent to BB's use of Summit's marks and copyrights.  BB also raises a number of other legal defenses to Plaintiff's claims.

The parties have submitted cross-motions for summary judgment.  Having read and considered the pleadings and supporting evidence, and having heard argument of the parties, the Court **GRANTS in part** and **DENIES in part** Summit's motion for summary judgment on liability; **GRANTS** Summit's motion for summary judgment on BB's counter-claims; and **DENIES** BB's motion for summary judgment on Summit's trademark dilution claim.  The Court concludes that the undisputed facts demonstrate that Summit has established its trademark and copyright infringement claims as a matter of law and that it did not infringe on BB's trade dress rights.  However, the Court concludes that genuine issues of material fact exist as to Summit's claim for trademark dilution.  The Court explains its reasoning in greater detail below.

## II.

## BACKGROUND

### A. FACTS

Despite voluminous submissions by the parties, the facts are relatively straightforward and largely undisputed.  Summit is the producer and distributor of the "Twilight" series of films.  (Docket No. 80, Defendant's Statement of Genuine Disputed Facts and Statement of Disputed Facts in Opposition to Plaintiff's Motion for Summary Judgment on Liability ("SUF") ¶¶ 1-2.)  The first film, "Twilight," was released in November 2008; "The Twilight Saga: New Moon" in November 2009; and "The Twilight Saga: Eclipse" in June 2010.  (Id. ¶¶ 3-4.)  Together, the films have generated more than $1 billion in gross revenues.  (Id. ¶ 133.)

Summit also owns various intellectual property rights related to the films, the licensing of which has grossed an additional $63 million.  (Id. ¶ 15.)  Specifically,

Summit is the owner of the trademark "TWILIGHT" in both block letters and in a distinctive font, as well as registrations and pending federal trademark applications for the Twilight marks on a number of goods, including clothing.  (Id. ¶¶ 5, 7.)  Summit has used the Twilight marks in the sale of a variety of goods and services.  (Id. ¶ 6.)  Summit also owns a registration of the "BELLA'S CHARM BRACELET" mark for bracelets, various applications for the "BELLA TWILIGHT" mark for a variety of goods, and has used the trademark "Bella" in conjunction with a number of goods and services related to the film.  (Id. ¶¶ 8-9.)  Finally, Summit owns copyrights in all publicity, promotional, unit, and special shoot photography and artwork related to the films, including in the "Bella Trading Card image," which is the subject of its copyright infringement claim.  (Id. ¶¶ 10-12.)  Summit first sold clothing bearing the Twilight mark, including jackets, in May of 2008.  (Id. ¶¶ 14, 16.)

Defendant BB is in the business of manufacturing women's clothing.  (Id. ¶ 18.)  BB sells clothes directly to consumers through its website, as well as through online and brick and mortar retailers.  (Id. ¶ 19.)  In 2006, BB began manufacturing a women's cargo jacket it originally named the "Leigh" jacket ("the Jacket") (Id. ¶ 23), which it subsequently discontinued in 2008.  (Id. ¶ 24.)  The Jacket was then worn by the "Bella Swan" character in the "Twilight" film.  (Id. ¶ 25.)  In March 2009, Entertainment Weekly ("EW") published in its magazine a movie still in which "Bella" is wearing the Jacket ("the EW Image"), along with a photograph of the Jacket itself and a note that it was made by BB Dakota.  (Id. ¶ 25.)

Shortly thereafter, BB decided to begin manufacturing the Jacket again, re-naming it the "Twilight jacket."  (Id. ¶ 26.)  In March 2009, BB's outside public relations contractor, Erika Klein, contacted EW to request permission to republish the EW image on BB's website, and was told by EW's representative that BB would need permission from Summit to do so.  (Id. ¶¶ 30-32.)  Klein then e-mailed Amanda Boury, Summit's manager of national publicity, and requested permission to re-publish the EW image, a link to which she included in the e-mail.  (Id. ¶ 37.)  The parties do not dispute

3

that the ensuing chain of four e-mails is the extent of the communications between

Klein and Boury, which BB alleges create a triable issue as to whether it had consent to

use other images in which Summit owned copyrights.  The first e-mail reads as follows:

> Hi Amanda,
> I was given your contact info from Vivan Maver's office.  One of our client's
> jackets (BB Dakota) is worn on Bella from the Twilight movie. We had such a
> huge response to the jacket that we are reissuing it. We would like to highlight
> the jacket on our web site along with the image from the movie. Is it okay for us
> to use the enclosed image? Thank you for your help.
>
> Best, e.
>
> http://www.ew.com/ew/gallery/0,,20234559 20234565 20266886 5,00.htm

(Docket No. 58-2, Compendium of Deposition Exhibits, Part I, Ex. 6 [March 26, 2009

E-Mail] ("Klein/Boury E-Mail").)[1]  Less than an hour later, Boury responded to Klein's

e-mail with one word: "Ok".  (Id.)  A few days later, on March 31, Klein followed up

on the original exchange of e-mails and asked, "Hi Amanda, One more special request.

Is it possible for the store, Metropark to use the image as wel [sic]".  (Id.)  Boury again

responded with one word: "sure".  (Id.)

> Without seeking further permission, BB then created "hangtags," to be affixed

to the Jackets, which included not the EW image, but the "Bella image."  (SUF ¶¶ 42-

43.)  The Bella image is a copyrighted image of the Bella character wearing the Jacket,

which Summit has used to promote the film on promotional posters, clothing, and so on.

(Id. ¶ 12.)  As compared to BB's other hangtags, the tag affixed to the Jacket was large.

(Id.  ¶ 47.)  According to the deposition testimony of BB's former president, Greg

Garrett, the hangtag for the Jacket was the only instance from 2003 through 2009 in

which BB created and used a hangtag for an individual item, as opposed to a line of

---

[1]At the hearing on the pending motions, BB sought refuge in the fact that the attachment to the email
contained more than one image.  BB also argued the last sentence amounts to a request for permission to
do more than use the image on its website.  However, Klein, who as noted was a public relations
representative for BB has consistently acknowledged that the only image for which she sought permission
was the EW image.  Moreover, the record also reflects, as discussed below in the text, the Klein warned
BB about the potential consequences of using images without Summit's permission, but her advice was
disregarded.  Finally, the last sentence cannot be taken out of context – the prior sentence clearly explains
precisely what is being requested in the final sentence of the email.

clothing.  (Id. ¶ 50; Docket No. 62-83, Ex. Z [Garrett Deposition Transcript] ("Garrett Depo.") at 40:6-22.)  Garrett further testified that hangtags are used to increase customer awareness and improve sales.  (Id. ¶ 51; Garrett Depo. at 39:24-40:5.)

The deposition testimony of Klein and Garrett sheds light on the various parties' understanding of the import of the Klein/Boury e-mails.  Klein acknowledges in her deposition testimony that she believed she had received from Boury permission to use only the EW image, only on the BB website.  (Id. ¶ 52; Docket No. 62-84, Ex. CC [Klein Deposition Transcript] ("Klein Depo.") at 77:13-21, 83:20-23.)  Indeed, Klein testified that in a 2009 meeting with Garrett and Gloria Brandes, BB's owner, Klein explicitly told Brandes and Garrett that BB did not have permission to use the Bella image for any purpose, and that BB's lawyers would have to contact Summit to secure such permission.  (Id. ¶ 53; Klein Depo. at 84:23-87:15, 91:3-25.)  Klein testified that in the course of this meeting, Brandes showed Klein the Bella image and told Klein that Brandes wanted to use the image on the hangtags.  (Id. ¶ 54; Klein Depo. at 84:23-87:15, 91:3-25.)  When Klein told Brandes that Summit's permission was needed, Brandes told Klein that the image could be used so long as BB included the language, "As seen in the movie Twilight."  (Id.)  Garrett confirms that these conversations occurred, and BB disputes neither that they occurred nor their contents.  (Id. ¶¶ 53, 55; Garrett Depo. at 66:16-68:20.)

For its part, BB maintains that it "may have had consent to use the Bella Image" because Boury "testified that when she clicked on the EW.com link in Klein's email, the first image was not the [EW image]"; and that she therefore had to "click on multiple links before reaching the [EW image]."  (See, e.g., Id. ¶ 52.)  BB asserts that the EW image was the sixth image in an eleven-image gallery, and that no evidence has been provided as to what the other ten photos were.  (Id.)  It therefore argues that use of a hyperlink to refer to the EW image in Klein's e-mail resulted in some ambiguity as to which image was being referenced.  (Id.)

After the correspondence with Boury, BB's agents engaged in a series of communications which led to BB's retail partners' use of the image.  In April 2009, Yvonne King, a buyer at Metropark USA, Inc. ("Metropark"), a clothing retailer, e-mailed Klein to ask if Metropark could use the Bella image on its website.  (Id. ¶ 56.) Klein testified that despite requesting permission from Brandes to seek Summit's consent for Metropark's use of the image, Brandes instructed Klein not to do so.  (Id. ¶ 58; Klein Depo. at 83:6-18, 85:23-86:9.)  Klein then told King that the image could be used on Metropark's website, so long as the "As seen in the Twilight film" language was included.  (Id. ¶ 59.)  Thereafter, Metropark published the image on its website. (Id. ¶ 60.)  King testified that the purpose of the hangtag in this instance was "[t]o communicate the [Twilight] movie," or "to draw an association between the jacket and the Twilight movie."  (Docket No. 62-83, Ex. AA [King Deposition Transcript] ("King Depo.") at 98:17-99:5, 102:2-5.)

On April 22, 2009, Jill Stein, a BB sales representative, sent the Bella image to all two hundred of her sales accounts via e-mail, representing both that BB had permission to use the image on the hangtag, and that the "image can be used when publicizing the product."  (Id. ¶ 61; Docket No. 62-84, Ex. BB, [Stein Deposition Transcript] ("Stein Depo.") 115:7-19, 116:3-117:3, 118:1-18.)  Garrett then had his assistant forward a copy of that April 22 e-mail to each of BB's sales representatives, with instructions to send the hangtag image to each of their respective customers.  (Id. ¶ 62.)  One of these customers, Metropark, used the image as part of an "e-mail blast," which was sent to hundreds of thousands of its customers.  (Id. ¶ 64.)  Almost all of the retailers with websites posted the image on their websites, and many used it as part of internet-based promotions.  (Id. ¶¶ 65-66.)  Both Metropark and ModCloth, Inc. ("ModCloth"), another such retailer, believed that Summit had licensed BB the right to use the Bella image and the Twilight marks.  (Id. ¶ 101.)  BB published the image on its own website, referring to it as the "Twilight jacket," and created physical point-of-sale advertisements featuring the image, which were distributed to certain retailers to be

displayed in their stores.  (Id. ¶¶ 69-71.)  The Bella image appeared on a hangtag

affixed to each jacket sold from May 2009 through June 2010, when Summit filed the

instant lawsuit.  (Id. ¶ 72.)

In June 2010, upon learning that Metropark was marketing a "Twilight jacket"

and using the Bella image on its website, Summit sent a cease and desist letter to

Metropark.  (Id. ¶ 74.)  Metropark notified BB, after which Brandes had Klein forward

to Brandes the March 2009 e-mail chain between Boury and Klein.  (Id. ¶ 74-76.)  In

September 2009, Summit sent a cease and desist letter to ModCloth, who was also

selling the "Twilight jacket" and using the Bella image on its website.  (Id. ¶ 78.)

ModCloth also forwarded the letter to its BB sales representative, Stein, and then to

BB's current president, Carol Christopherson, demanding indemnification in order to

continue selling the jacket.  (Id. ¶ 79.)  Brandes told Stein, via e-mail, to send to

ModCloth the March 2009 e-mails between Boury and Klein, with instructions to

represent that the e-mails gave BB, and therefore ModCloth, the right to use the Bella

image.  (Id. ¶ 80.)  Brandes also had Stein tell ModCloth that BB does not really call the

Jacket the "Twilight jacket," but that this is merely what people on the internet referred

to it as.  (Id. ¶ 81.)  However, both Christopherson and Stein testified that the name of

the jacket was the "Twilight jacket."  (Id. ¶ 82.)

In September 2009, after again receiving a request from Brandes to forward to

her the March 2009 e-mails between Klein and Boury, Klein wrote to Christopherson:

> Hi Carol, I sent you the email with approval for a specific image [EW image]
> that we used on the website. We never got approval for the hangtag. When we
> met over this, Greg and Gloria thought that by including the words "as seen in"
> would allow them usage of the image. This question would have required BB
> Dakota's attorney to request usage for the hangtag.

(Id. ¶ 85; Klein Depo. at 115:2-117:7; Docket No. 58-2, Ex. 35 [September 15, 2009 E-

Mail].)  Christopherson testified that she paid no attention to Klein's e-mail or

ModCloth's inquiry because Brandes told her that she would take care of the matter.

(Id. ¶ 86.)

BB continued to use the Bella image on its website, and developed (but did not release) a more complete line of "Twilight-inspired" garments.  (Id. ¶ 87.)  Summit alleges that it waited for "the alleged permission correspondence referred to by Metropark," but never received the e-mails.  (Id. ¶ 77.)  Summit alleges that it did not locate the Boury/Klein e-mail exchange itself until 2010, and then sent BB a cease and desist letter in May 2010.  (Id. ¶ 88-89.)  BB alleges that Summit "was in possession" of the e-mails since they were exchanged in March 2009.  (Id. ¶ 88.)

Summit then commenced the instant action, asserting against BB, Metropark, and ModCloth claims for (1) false designation of origin; (2) trademark infringement; (3) trademark dilution; (4) copyright infringement; and (5) unfair competition.  (Docket No. 1, Compl.)  BB then discontinued use of the Bella image on its website and on the hangtags, and changed the name of the "Twilight jacket" to the "Nicola" jacket.  (SUF ¶ 91-92.)  It also instructed its various retailers to cut the hangtags from their existing stock, and created a new hangtag that contained not the Bella image, but a picture of a girl resembling the Bella character.  (Id. ¶ 93-94; Docket No. 62-81, Declaration of Paul Bost ("Bost Decl."), Ex. U.)  Nevertheless, BB continued to refer to, and various retailers continued to market the jacket as the "Twilight jacket."  (Id. ¶ 96.)

BB answered and cross-complained for trade dress infringement and unfair competition.  (Docket No. 12.)  Metropark answered and cross-claimed against BB for breach of contract.  (Docket No. 25.)  On May 9, 2009 Metropark filed a Suggestion of Bankruptcy, informing the Court that it had "filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code with the clerk of the court in the United States Bankruptcy Court for the Southern District of New York, Case No. 11-22866 (RDD)," and that "[a]ccordingly, this action has been stayed by the operation of 11 U.S.C. §362."  (Docket No. 33.)  On September 13, 2011, Summit and ModCloth stipulated to dismissal of any claims against ModCloth, with prejudice.  (Docket Nos. 51, 68.)

8

After extensive discovery, BB moved for summary judgment on Summit's trademark dilution cause of action.  (Docket No. 52, Mem. ("BB-Mem.").)  Summit moved for summary judgment on BB's counter-claims for trade dress infringement and unfair competition, and then on liability.  (Docket No. 55, Mem. ("1st Summit-Mem."); Docket No. 58-1, Mem. ("2d. Summit-Mem.").

### III.

### THE ISSUES

As set forth in greater detail below, BB's contention that its reproduction of Summit's intellectual property was consented to and/or constituted "fair use" finds no support in the factual record or legal authorities.  The brief exchange of e-mails which Defendant alleges create a triable issue of fact as to consent to use Summit's copyrighted imagery demonstrate a clearly circumscribed license to use a <u>different</u> image, which subsequent internal discussions confirm BB's agents understood.  Moreover, BB cannot assert that its use of Summit's marks constituted "nominative fair use" given that its use of the marks and images was far more extensive and suggestive than necessary to identify the product.

To the contrary, Summit has established all of the necessary elements for its claims of copyright and trademark infringement, and thus false designation of origin and unfair competition.  Summit's claim for trademark dilution, however, is subject to a higher standard for "fame," which the Court does not find satisfied on the basis of record currently before it.  Finally, the undisputed facts establish that BB Dakota's counter-claims for trade dress infringement and unfair competition fail as a matter of law, as BB Dakota cannot show that it has established secondary meaning in the trade dress, let alone before Summit began using the Jacket in its films.

### IV.

### DISCUSSION

**A.  LEGAL STANDARD FOR SUMMARY JUDGMENT**

9

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  Thus, when addressing a motion for summary judgment, the Court must decide whether there exists "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial, which it can meet by presenting evidence establishing the absence of a genuine issue or by "pointing out to the district court ... that there is an absence of evidence" supporting a fact for which the nonmoving party bears the burden of proof. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  To defeat summary judgment, the nonmoving party must put forth "affirmative evidence" that shows "that there is a genuine issue for trial." Anderson, 477 U.S. at 256–57.  This evidence must be admissible. See Fed. R. Civ. P. 56(c), (e).  The nonmoving party cannot prevail by "simply show[ing] that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rather, the nonmoving party must show that evidence in the record could lead a rational trier of fact to find for it. See Id. at 587.  In reviewing the record, the Court must believe the nonmoving party's evidence, and must draw all justifiable inferences in its favor. Anderson, 477 U.S. at 255.

**B.  SUMMIT'S CLAIMS FOR TRADEMARK INFRINGEMENT, FALSE DESIGNATION OF ORIGIN, AND UNFAIR COMPETITION**

Summit moves for summary judgment on its claims for trademark infringement, false designation of origin, and unfair competition.  (2d. Summit-Mem.)  Summit alleges that the use of the Twilight and Bella trademarks, as well as the Bella image, "constitute a false designation of origin and a false description or representation that wrongfully and falsely designates the Bella Jacket as originating from Summit, or being associated or affiliated with or authorized or endorsed by Summit" (Compl. ¶ 29); that "Defendants have used in commerce without Summit's permission, the TWILIGHT and

1   BELLA marks in a manner that is likely to cause confusion with respect to the source

2   and origin of the Bella Jacket and is likely to cause confusion or mistake and to deceive

3   purchasers as to the affiliation, connection, or association of Summit with Defendants

4   and/or their products (Id. ¶ 36); and that "Defendants have been, and are, engaged in

5   'unlawful, unfair or fraudulent business practices' in violation of §§ 17200 et seq. of the

6   California Bus. & Prof. Code and acts of unfair competition in violation of the common

7   law." (Id. ¶ 60.)

8          BB contends (1) that Summit does not have trademark rights in the Bella mark

9   for use on clothing; (2) that BB's use of the Twilight and Bella marks constituted

10  "nominative fair use"; and (3) that evidence of likelihood of consumer confusion is

11  sparse and disputed. (Docket No. 74, 2d. BB-Opp. at 13-22.) For the reasons set forth

12  below, the Court finds that on the basis of the undisputed facts before it, Summit is

13  entitled to summary adjudication of these causes of action.

14      **1. LEGAL STANDARD**

15         Claims of trademark infringement under 15 U.S.C. § 1114, false designation of

16  origin under 15 U.S.C. § 1125(a), and common law unfair competition and unfair

17  competition under Cal. Bus. & Prof. Code §§ 17200 et seq., "are subject to the same

18  test." Jada Toys, Inc. v. Mattel, Inc., 518 F.3d 628, 632 (9th Cir. 2008); Century 21

19  Real Estate Corp. v. Sandlin, 846 F.2d 1175, 1178 (9th Cir. 1988). To prevail on a

20  claim for trademark infringement, a plaintiff must show (1) that it owns a valid,

21  protectable mark; (2) that defendant used the mark without consent; and (3) that use of

22  the mark is likely to cause confusion. 15 U.S.C. § 1114(1); Century 21 Real Estate

23  Corp., 846 F.2d 1175. "The critical determination is whether an alleged trademark

24  infringer's use of a mark creates a likelihood that the consuming public will be confused

25  as to who makes what product." Jada Toys, Inc., 518 F.3d at 632 (citing Brother

26  Records, Inc. v. Jardine, 318 F.3d 900, 908 (9th Cir. 2003) (quotations omitted)).

27

28

### 2. OWNERSHIP OF THE MARKS

The parties agree that Summit is the owner of the TWILIGHT trademark in both block letters and in distinctive font, as well as the "Bella's Charm Bracelet" mark for bracelets. (SUF ¶¶ 5, 8.) Summit also asserts that it owns common law rights in the Bella mark for clothing and other types of merchandise related to the Twilight films, in light of its "extensive nationwide advertising campaign ... and extensive nationwide sales of products" bearing that mark. (2d. Summit-Mem. at 17-18.) BB contends that Summit does not own common law trademark rights in the Bella mark for use on clothing, as another entity holds a registration of "Bella" for use on women's and children's clothing, and because "Bella" has been "used in connection with clothing by other retailers." (2d. BB-Opp. at 14.)

As an initial matter, the Court finds that ownership of the Bella marks is immaterial, as it is undisputed that Summit owns trademark rights in the Twilight mark, both in block letters and in distinctive font, and the Twilight mark was present on each and every hangtag, and on the various parties' e-mails and websites. (SUF ¶¶ 5-7.) Summit owns federal registrations for the Twilight mark, which constitute prima facie evidence of "the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services." 15 U.S.C. § 1115(a). Moreover, regardless of whether Summit owns common law rights in the Bella mark, the Ninth Circuit has held that "proof of copying strongly supports an inference of secondary meaning," Vision Sports, Inc. v. Melville Corp., 888 F.2d 609, 615 (9th Cir. 1989), which, along with Summit's extensive use and promotion of the mark, would be sufficient for purposes of demonstrating ownership.

Accordingly, the Court finds that no genuine issue of material fact exists as to whether Summit owns either the Twilight or Bella marks for clothing and other merchandise related to the films.

### 3. LIKELIHOOD OF CONFUSION

"[The Ninth Circuit] employ[s] an eight factor test in determining the likelihood

of confusion." Jada Toys, Inc., 518 F.3d at 632 (citing Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp., 174 F.3d 1036, 1053–54 (9th Cir. 1999)). "These factors include: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines." Id. (citing AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348–49 (9th Cir. 1979)). The Ninth Circuit applies "all of the relevant factors, noting that a final likelihood of confusion determination may rest on those factors that are of the most relative importance in any particular case." Id. (citing Surfvivor Media, Inc. v. Survivor Prods., 406 F.3d 625, 630 (9th Cir. 2005)); see also Eclipse Associates Ltd. v. Data General Corp., 894 F.2d 1114, 1118 (9th Cir. 1990) ("The Ninth Circuit enumerated likelihood of confusion tests as helpful guidelines to the district court. These tests were not meant to be requirements or hoops that a district court need jump through to make the determination. Our court has never articulated specific factors that a district court must recite and apply, instead, we have identified a non-exclusive series of factors that are helpful in making the ultimate factual determination. ... The district court's primary task, in determining infringement of registered trademarks, is to make the factual determination whether the public is likely to be deceived or confused by the similarity of the marks as to source, relationship or sponsorship.")

However, the Ninth Circuit has recently stated unambiguously that "nominative fair use 'replaces' Sleekcraft as the proper test for likely consumer confusion whenever defendant asserts to have referred to the trademarked good itself." Toyota Motor Sales, U.S.A., Inc. v. Tabari, 610 F.3d 1171, 1182-1183 (9th Cir. 2010); see also Cairns v. Franklin Mint Co., 292 F.3d 1139, 1150 (9th Cir. 2002). In reversing a summary judgment order, the court in Toyota Motor Sales, directed the district court to "eschew application of Sleekcraft and analyze the case solely under the rubric of nominative fair use," rather than, as the district court had done, "treat[] nominative fair use as an

affirmative defense to be established by [defendants] only after [plaintiffs] showed a likelihood of confusion under <u>Sleekcraft</u>."  <u>Id.</u>

Thus, because BB argues that its use of the marks constituted "nominative fair use," Summit's infringement claim will be analyzed solely under that framework.

**4. NOMINATIVE FAIR USE**

The nominative fair use defense was first articulated by the Ninth Circuit in <u>New Kids on the Block v. News America Pub., Inc.</u>:

> If the defendant's use of the plaintiff's trademark refers to something other than the plaintiff's product, the traditional fair use inquiry will continue to govern. But, where the defendant uses a trademark to describe the plaintiff's product, rather than its own, we hold that a commercial user is entitled to a nominative fair use defense provided he meets the following three requirements: First, the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.

971 F.2d 302, 308 (9th Cir. 1992) (emphasis added).

In <u>Toyota Motor Sales</u>, the Ninth Circuit recently held that the plaintiff "must bear the burden of establishing that the [defendant's] use of the ... mark was not nominative fair use," because "as the Supreme Court has unambiguously instructed, the Lanham Act always places the 'burden of proving likelihood of confusion ... on the party charging infringement.'") 610 F.3d 1171, 1182-1183 (9th Cir. 2010).  The court went on: "A finding of nominative fair use is a finding that the plaintiff has failed to show a likelihood of confusion as to sponsorship or endorsement. ... A defendant seeking to assert nominative fair use as a defense need only show that it used the mark to refer to the trademarked good," after which "[t]he burden then reverts to the plaintiff to show a likelihood of confusion."  <u>Id.</u>

Thus, Summit must negate the three elements articulated above: (1) "the product or service must be one not readily identifiable without use of the trademark"; (2) "only so much of the mark or marks may be used as is reasonably necessary to identify the product or service"; and (3) "the user must do nothing that would, in conjunction with

14

the mark, suggest sponsorship or endorsement by the trademark holder."  The parties contest all three elements.

### a.  Readily Identifiable

Summit "acknowledges that the first Twilight movie is not identifiable absent use of the TWILIGHT mark," but contends that "BB Dakota cannot identify any reason why the first Twilight movie is not readily identifiable without use of the BELLA mark."  (2d. Summit-Rep. at 18.)  Although Summit does not make the argument, this logic is just as, if not more applicable to BB's use of the <u>stylized</u> Twilight mark, as will be discussed below in connection with the "reasonably necessary" prong of nominative fair use analysis.

In discussing this first element in <u>Horphag Research Ltd. v. Pellegrini</u>, the Ninth Circuit reasoned that despite the fact that "nominative fair use analysis acknowledges that it is often virtually impossible to refer to a particular product for purposes of comparison, criticism, point of reference or any other such purpose without using the mark," the "core element of trademark infringement law is whether an alleged trademark infringer's use of a mark creates a likelihood that the consuming public will be confused as to who makes the product."   328 F.3d 1108, 1112 (9th Cir. 2003). Accordingly, the circuit explains that a "nominative fair use defense is available only if the use of the trademark does not attempt to capitalize on consumer confusion or to appropriate the cachet of one product for a different one."  328 F.3d 1108, 1112 (9th Cir. 2003) (citations and quotations omitted).   In sum, BB cannot defeat summary judgment merely by arguing that it needed to use the Twilight marks to identify the product.  Indeed, there is a real question as to whether any use was necessary given the fact that the jacket had been successfully marketed for two to three years before the first Twilight movie was released.

However, assuming for purposes of argument that BB had some right to point out that the Bella character had worn its jacket, this first prong must be read in context with the other two elements.  Here while it may have been necessary to make some

1   reference to the movie to explain how the jacket had been used and by whom it was

2   worn, that could have been done without using the Bella image and the actual Twilight

3   mark with its particular font, and certainly without renaming and marketing the jacket as

4   "the Twilight jacket."  I short, BB made far more extensive use of Summit's marks and

5   copyrighted materials than was necessary to make the "identification" arguably

6   permitted under the "nominative fair use" doctrine.

7                    ***b. Reasonably Necessary***

8          With regard to the "reasonably necessary" prong, BB argues that "[t]wo or three

9   references to trademarks can hardly be considered excessive," and that "a jury could

10  easily find that three references to 'twilight' and 'bella' was reasonably necessary for

11  nominative use."  (2d. BB-Opp. at 18.)  But this element cannot be satisfied by a

12  numerical analysis.  Rather, the question is whether the manner of BB's use was

13  designed to "appropriate the cachet of one product for a different one."  On that

14  question, there is not genuine dispute of fact – BB clearly sought to associate its product

15  with the highly successful Twilight series to enhance its own profits.

16         Case law disposes of BB's argument.  In a footnote regarding this second

17  element in the very case that originated the nominative fair use defense, Judge Kozinski

18  wrotes that "a soft drink competitor would be entitled to compare its product to

19  Coca-Cola or Coke, but would not be entitled to use Coca-Cola's distinctive lettering."

20  Id. (emphasis added) (citing Volkswagenwerk Aktiengesellschaft v. Church, 411 F.2d

21  350, 352 (9th Cir. 1969)  ("Church did not use Volkswagen's distinctive lettering style

22  or color scheme, nor did he display the encircled 'VW' emblem"); Walt Disney

23  Productions v. Air Pirates, 581 F.2d 751, 758 (9th Cir. 1978) (taking "more than was

24  necessary" can defeat copyright fair use defense)).  Just this year, the Ninth Circuit re-

25  affirmed this point.  See Toyota Motor Sales, 610 F.3d at 1182 ("As for the second and

26  third steps of our nominative fair use analysis, Toyota suggests that use of the stylized

27  Lexus mark and "Lexus L" logo was more use of the mark than necessary and

28  suggested sponsorship or endorsement by Toyota. This is true: The Tabaris could

                                          16

adequately communicate their message without using the visual trappings of the Lexus brand.  Moreover, those visual cues might lead some consumers to believe they were dealing with an authorized Toyota affiliate.") (citations omitted).  In short, these cases make the obvious point that one can reference a product without actually using the trademark that identifies the product.  The record here demonstrates that BB failed to respect that distinction.

As Summit points out, "BB Dakota used the stylized Twilight Marks on hangtags and on promotional materials, including its website and point-of-sale advertisements ... [as well as] literally renamed the jacket 'Twilight' and extensively advertised it as the 'Twilight Jacket.'" (2d. Summit-Mem. at 22.)  Accordingly, BB cannot now argue that such extensive use of Summit's intellectual property was "reasonably necessary" to inform its customers that the Jacket was the same as that worn in the films.  Indeed, as one of BB's customers acknowledged, the purpose of the hangtag was "to draw an association between the jacket and the Twilight movie."  There can be no genuine dispute that the selection, placement and use of Summit's marks was done precisely to achieve a purpose not permitted by the nominative fair use doctrine – the suggestion of sponsorship to which the Court now turns.

### c.  Suggestion of Sponsorship

As the foregoing discussion indicates, the extensive use of Summit's intellectual property at the very least implied sponsorship of the BB jacket.  But there are additional facts that bear on this element.  Summit notes that "BB Dakota has offered its jacket through retailers also offering Summit's licensed products."  (2d. Summit-Mem. at 22-23.)  BB counters that selling through the same retailers is insufficient, and that the "evidence establishes that no consumer believed that the jacket was sponsored or endorsed by Summit," citing user comments on Entertainment Weekly's website and deposition testimony of a Metropark Employee who said that customers found the jacket by "zoom[ing] in on the movie still and [seeing] the BB Dakota on the button." (2d. BB-Opp. at 18.)   While selling through the same retailers, without more, would be

17

sufficient to establish a suggestion of sponsorship, the record shows much more as already noted.  Furthermore, in its reply, Summit cites to evidence that both Metropark and ModCloth "were under the impression that Summit licensed BB Dakota the right to use the [marks], and only used the [marks] under color of such alleged permission." (2d. Summit-Rep. at 21; SUF ¶ 101.)  Summit suggests that if "sophisticated marketing professionals were confused as to Summit's license or sponsorship of the jacket, there is no question that ordinary consumers would be or are likely to be confused."  (Id.)  The Court agrees.

In Brother Records, Inc. v. Jardine, the Ninth Circuit rejected a nominative fair use defense for failure to satisfy this third prong because the defendant had used the relevant mark "prominently and boldly," thus "suggesting sponsorship."  318 F.3d 900, 908 (9th Cir. 2003).  The court cited evidence that defendant's management had recommended including the trademark to "create or enhance marquee value," and that "event organizers" had expressed confusion about the association between the marks. Id.  The same kind of evidence is present here.  The hangtags affixed to the Jacket were, as BB's former president Greg Garrett admitted, both larger than other hangtags used by BB and explicitly intended to associate the Jacket with the Twilight films.  (SUF ¶ 47.) Moreover, Yvonne King, Metropark's buyer, confirmed Garrett's understanding of the purpose of the hangtags, and testified that she in fact believed that Summit had licensed use of the Bella image.  (King Depo. at 98:17-99:5, 102:2-5.)  Thus, the undisputed evidence establishes that BB not only suggested association and/or sponsorship through its use of the hangtags, but that it intended to do so by creating the misleading impression that it had obtained Summit's permission for the use of the images and marks.

### 5. CONCLUSION

The undisputed facts establish all necessary elements of Plaintiff's claims of trademark infringement, false designation of origin, and unfair competition.  It is undisputed that Summit owns the marks at issue, and Plaintiff has negated all three

elements of BB's nominative fair use defense.  The Court finds that there is no genuine issue of material fact as to whether the Jacket was "readily identifiable" absent the marks Defendant used in its promotion; whether such extensive use was "reasonably necessary" to identify the Jacket; or whether BB Dakota suggested sponsorship through its use of the hangtags.  Accordingly, the Court **GRANTS** Plaintiff's summary judgment motion as to its claims for trademark infringement, false designation of origin, and unfair competition.

**B.  SUMMIT'S CLAIM FOR TRADEMARK DILUTION**

Plaintiff's third cause of action for trademark dilution arises under 15 U.S.C. § 1125(c) and Cal. Bus. & Prof. Code § 14330.  (Compl. ¶¶ 42-49.)  Plaintiff alleges that it had used the Twilight mark "to identify its products relating to the Twilight Motion Pictures before Defendants began promoting and selling the Bella Jacket or otherwise used the Twilight Mark."  (Id. ¶ 43.)  Plaintiff further alleges that "the Twilight mark is inherently distinctive and has acquired distinction through Summit's extensive, continuous, and exclusive use" of it.  (Id.)  Finally, Plaintiff alleges that the mark is "famous and distinctive" within the meaning of the 15 U.S.C. § 1125, and that Defendants' use of the mark is "likely to dilute the distinctive quality of Summit's mark in violation" of that statute.  (Id. ¶¶ 44-45.)  Plaintiff seeks actual damages sustained as a result of Defendants' wrongful acts; the "gains, profits, and advantages Defendants have obtained as a result" of those acts; and all remedies available under 15 U.S.C. §§ 1117 and 1118.  (Id. ¶¶ 47-49.)  The parties have essentially cross-filed for summary judgment on the dilution claim.  BB filed a motion for summary adjudication of only that cause of action,  (BB-Mem.), after which  Summit filed a motion for summary judgment as to liability, in which it asks for summary adjudication of the dilution claim. (2d. Summit-Mem.)

In its motion for summary judgment, BB contends that Summit can establish neither (1) that the mark is famous; or (2) that Defendants' use of the mark dilutes it.

(BB-Mem. at 7.)  For the reasons set forth below, the Court finds that genuine issues of material fact exist as to whether the Twilight mark is famous for purposes of a dilution claim.

### 1. LEGAL STANDARD

"A plaintiff seeking relief under federal anti-dilution law must show that its mark is famous and distinctive, that defendant began using its mark in commerce after plaintiff's mark became famous and distinctive, and that defendant's mark is likely to dilute plaintiff's mark."  Visa Intern. Service Ass'n v. JSL Corp., 610 F.3d 1088, 1089-1090 (9th Cir. 2010); see also Jada Toys, 518 F.3d at 634 ("In order to prove a violation, a plaintiff must show that (1) the mark is famous and distinctive; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark is likely to cause dilution by blurring or dilution by tarnishment.")  "Whether a defendant's mark creates a likelihood of dilution is a factual question generally not appropriate for decision on summary judgment.  Nevertheless, summary judgment may be granted in a dilution case, as in any other, if no reasonable fact-finder could fail to find a likelihood of dilution."  Id.  "[I]n an appropriate case, the district court may conclusively determine one or more of these factors before trial."  Id.

### 2. APPLICABLE LAW

In light of recent changes in federal trademark dilution law, the Court first addresses the proper standard to be applied.

The Trademark Dilution Revision Act (TDRA) was passed in 2006, replacing the Federal Trademark Dilution Act of 1995 (FTDA).  The TDRA was passed "largely in response to the [Supreme Court's decision in Moseley v. V Secret Catalogue, Inc., 537 U.S. 418 (2003)]," which had held that the text of the FTDA "unambiguously requires a showing of actual dilution, rather than a likelihood of dilution."  Levi Strauss & Co. v. Abercrombie & Fitch Trading Co., 633 F.3d 1158, 1165 (9th Cir. 2011).  In the TDRA, Congress clarified that a plaintiff must demonstrate only a "likelihood of

dilution," and articulated a series of relevant factors for a court to consider in conducting that inquiry. Congress also amended the statutory language pertaining to a mark's "fame." The FTDA had set forth eight non-exclusive factors for courts to consider in determining whether a mark is "distinctive and famous." 15 U.S.C. § 1125(1) (2000) (repealed October 6, 2006). The TDRA, by contrast, defines a "famous mark" as one "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner," and sets forth the four non-exclusive factors discussed herein.

Ninth Circuit law provides strong support for dispensing with pre-TDRA case law. In Levi Strauss & Co., the court found that "Congress did not merely make surgical linguistic changes to the FTDA in response to Moseley. Instead, Congress created a new, more comprehensive federal dilution act. ... Thus, the text of the TDRA articulates a different standard for dilution from that which we utilized under the FTDA." 633 F.3d at 1166. The court found that "in adopting the TDRA, Congress decided to re-write 15 U.S.C. § 1125(c), as opposed to altering discrete wording or subsections. This action suggests that Congress did not wish to be tied to the language or interpretation of prior law, but instead crafted a new approach to our consideration of dilution-by-blurring claims." Id. at 1172; see also Jada Toys, 518 F.3d 628 at 635 (applying new statutory factors); Visa Intern. Service Ass'n v. JSL Corp., 590 F.Supp.2d 1306, 1315 (D. Nev. 2008) (reasoning that because "the TDRA factors have changed both in number and substance from the FTDA factors ... an intervening change in the law has occurred.")

The relevant legislative history reads as follows:

In addition, the circuits have split on the meaning and application of other core provisions of the statute. This absence of uniformity concerns the Committee, as it complicates the ability of mark holders to protect their property and businesses to plan their commercial affairs.

Hearings revealed that the regional circuits interpret the FTDA differently on such matters as what constitutes a "famous" mark, whether marks with "acquired distinctiveness" are protected under the statute, and whether the FTDA covers dilution by "tarnishment." The resulting problems were concisely

21

summarized at the Subcommittee's 2005 hearing as follows:

[D]ilution law in the United States is moving in every direction except the one that it needs to – forward. ... All the while, famous marks and their value both to consumers and their owners remain at risk from blurring and tarnishment, and third parties have little guidance regarding what marks they can safely adopt without risk of dilution liability. The lack of clarity in the law and the splits in the various circuits are resulting in forum shopping and unnecessarily costly lawsuits. For these reasons a revision of dilution law is needed.

The Committee subscribes to this view and H.R. 683 serves as a legislative response to these problems.

H.R. Rep. No. 109-23, 109th Congr., 1st Sess. 1091 (2005).  Thus, it is clear that Congress intended to offer stronger protection against dilution, and the modifications made to the statutory language must be read accordingly.

### 3. WHETHER THE TWILIGHT MARK IS SUFFICIENTLY "FAMOUS"

The reformulated TDRA, codified at 15 U.S.C. § 1125(c)(2)(A), provides that "a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner. In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:

(i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

(ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.

(iii) The extent of actual recognition of the mark.

(iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register."

In its motion for summary judgment, BB Dakota cites to a number of pre-TDRA Ninth Circuit cases which stress the difficulty of establishing a mark as "famous."[2]

---

[2]BB Dakota also argues that under Visa Intern., a "dictionary word is considered famous for dilution purposes only if it is a well-recognized brand and used exclusively by one company as a mark for its services." (BB-Mem. at 9.)  In that case, the Ninth Circuit reasoned that "[w]hen a trademark is also a word with a dictionary definition, it may be difficult to show that the trademark holder's use of the word is sufficiently distinctive to deserve anti-dilution protection because such a word is likely to be descriptive or suggestive of an essential attribute of the trademarked good."   610 F.3d at 1091.   As Summit points out, Congress removed

22

1   Summit, by contrast, delineates the four § 1125(c)(2)(A) factors and asserts that it has,

2   for instance, spent $75 million in promoting the mark, generated more than $1 billion

3   gross revenues from the Twilight motion pictures, sold over 25 million units of Twilight

4   DVDs, and so on.  (2d. Summit-Mem. at 6-7.)

5        Ninth Circuit law interpreting the TDRA's re-formulated standard is sparse, but

6   that which does exist supports simplifying the inquiry and applying the plain language

7   of the four factors delineated in the new statute.  Pursuant to that inquiry, the Court

8   finds that Summit has failed to establish beyond any genuine issue of material fact that

9   its marks are "famous" under § 1125(c)(2)(A).

10       Even under the TDRA, the case law has not been friendly to claims of fame.  In

11  Jada Toys, Inc., the Ninth Circuit cited the new statutory factors and summarily

12  concluded that a "a reasonable trier of fact could conclude that the HOT WHEELS

13  mark is famous," as it "has been in use for over thirty-seven years; 350 million dollars

14  have been expended in advertising the mark; three billion HOT WHEELS units have

15  been sold since the inception of the mark; and HOT WHEELS are sold in all fifty states

16  and throughout the world."  518 F.3d at 635.  In Apple, Inc. v. Amazon.com Inc., a

17  recent case involving the "App Store" mark, a district court in the Northern District of

18  California held that "Apple ha[d] not established that its 'App Store' mark is famous, in

19  the sense of being 'prominent' and 'renowned.'"  Docket No. 11-1327, 2011 WL

20  2638191, at *11 (N.D. Cal. 2011).  The court acknowledged evidence demonstrating

21  that "Apple ha[d] spent a great deal of money on advertising and publicity, and ha[d]

22  sold/provided/furnished a large number of apps from its AppStore," as well as found

23  that "actual recognition of the 'App Store' mark" had been established.  Id.  However,

24  the court found that there was "also evidence that the term 'app store' is used by other

25

26  "distinctiveness" as a consideration relevant to "fame" in the TDRA, and instead listed it as one
27  of the six factors relevant to "dilution."  (2d. Summit-Mem. at 9-10 n. 3.)  Thus, as Summit
    suggests, these arguments should be construed "as addressing the likelihood of dilution issue and
28  not fame."  (Id.)  Accordingly, they will be discussed below, in that context.

companies as a descriptive term for a place to obtain software applications for mobile devices."  Id.  Therefore, the court denied Apple a preliminary injunction.  Id.  In Vallavista Corp., a district court in the Northern District of California conducted analysis under both existing Ninth Circuit law and the § 1125(c)(2)(A) factors.  657 F.Supp. at 1132.  In spite of the fact that plaintiff used the relevant mark for twelve years, and had demonstrated advertising expenditures of $250,000 and sales of $1.7 million in the last four years, the court granted the defendant summary judgment on a dilution claim, stating that while "not dispositive," no survey evidence of actual recognition had been provided.  Id. at 1138.  See also Levi Strauss & Co. v. Abercrombie & Fitch Trading Co., Docket No. 07-03752, 2008 WL 4614660, *13-14 (N.D. Cal. 2008) (concerning "Arcuate" mark on denim, "[i]n light of third party usage of purportedly similar marks, the lack of specific figures for advertisements bearing only the Arcuate mark, the age of the materials regarding third party recognition, and the survey evidence, the Court concludes that there are facts from which a reasonable juror could reach a determination in either party's favor on the question of fame."); Nike, Inc. v. Nikepal Intern., Inc., Docket No. 05-1468, 2007 WL 2782030, at *6 (E.D. Cal. Sep. 18, 2007) (Nike mark found to be famous in light of two decades of national promotion, billions of dollars in sales, and recognition as evidenced by various publications).

As with Apple's "App Store" mark, the Twilight mark is strong, but is also used elsewhere.  Moreover, Summit has presented no survey evidence demonstrating recognition by the consuming public, despite the fact that the films have grossed over $1 billion.  Finally, as BB argues, Summit relies in part upon box office revenues and merchandising sales from the Twilight sequels, released after April 2009.  Thus, BB argues, the third factor of the dilution analysis – defendant's use of the mark after it became famous and distinctive – "has developed importance."  (Docket No. 96, Rep. ("BB-Rep.") at 3.)  BB argues that Summit must establish that the mark was famous in April 2009, when BB began using the mark on the Jacket.  (Id.)  BB's timing argument

24

presents an important consideration in deciding whether or not the Twilight mark is "famous" for purposes of a dilution cause of action.  As BB suggests, Summit offers no way to distinguish between its pre- and post-April 2009 advertising and sales figures. Such fact issues, along with those discussed above, are inappropriate for resolution on a summary judgment motion.

Accordingly, the Court finds that genuine issues of material fact exist as to whether the Twilight mark was sufficiently "famous" under 15 U.S.C. § 1125(c)(2)(A).

### 3. LIKELIHOOD OF DILUTION

15 U.S.C. § 1125(c)(2)(B) provides that "[f]or purposes of paragraph (1), 'dilution by blurring' is association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark.  In determining whether a mark or trade name is likely to cause dilution by blurring, the court may consider all relevant factors, including the following:

(i) The degree of similarity between the mark or trade name and the famous mark.

(ii) The degree of inherent or acquired distinctiveness of the famous mark.

(iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.

(iv) The degree of recognition of the famous mark.

(v) Whether the user of the mark or trade name intended to create an association with the famous mark.

(vi) Any actual association between the mark or trade name and the famous mark."

BB argues that Summit cannot establish the necessary "likelihood of dilution" because the Twilight mark is used by third parties, and because <u>Visa Intern.</u> held that "[w]hen a trademark is also a word with a dictionary definition, it is 'difficult to show that the trademark holder's use of the word is sufficiently distinctive to deserve anti-dilution protection.'" 610 F.3d at 1091.  (BB-Mem. at 14-15.)  Although Defendant does not characterize them as such, its third-party usage argument is best understood as

falling under 15 U.S.C. § 1125(c)(2)(B)(iii), "[t]he extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark," whereas its "dictionary" argument is best understood as falling under 15 U.S.C. § 1125(c)(2)(B)(ii), "[t]he degree of inherent or acquired distinctiveness of the famous mark."

In its own motion for summary judgment as to liability, Plaintiff argues that "BB Dakota used marks <u>identical</u> to the Twilight Marks on clothing for the very purpose of associating its product with Summit, the <u>Twilight</u> Motion Pictures, and their related merchandise." (2d. Summit-Mem at 25.) Thus, Plaintiff emphasizes the first and fifth § 1125(c)(2)(B) factors, namely "[t]he degree of similarity between the mark or trade name and the famous mark," and "[w]hether the user of the mark or trade name intended to create an association with the famous mark." 15 U.S.C. §§ 1125(c)(2)(B)(i) and 1125(c)(2)(B)(v).

As discussed above, this year in <u>Levi Strauss & Co.</u>, the Ninth Circuit found that because "Congress decided to re-write 15 U.S.C. § 1125(c), as opposed to altering discrete wording or subsections," Congress must not have wished "to be tied to the language or interpretation of prior law, but instead crafted a new approach to our consideration of dilution-by-blurring claims." 633 F.3d at 1172. Accordingly, the Court begins its analysis from the reformulated statutory language. However, as discussed below, prior case law interpreting the FTDA is relevant to the particular factors delineated by the TDRA.

### a. Degree of Similarity

The first factor, "[t]he degree of similarity between the mark or trade name and the famous mark," clearly weighs in favor of Summit. There is no dispute that BB Dakota used the Bella image, which contained a mark identical to the stylized Twilight mark Summit owns.

### b. Distinctiveness

As discussed above, BB Dakota argues that under <u>Visa Intern.</u>, a "dictionary word is considered famous for dilution purposes only if it is a well-recognized brand

26

and used exclusively by one company as a mark for its services." (BB-Mem. at 9.) In fact, the court reasoned that:

> When a trademark is also a word with a dictionary definition, it may be difficult to show that the trademark holder's use of the word is sufficiently distinctive to deserve anti-dilution protection because such a word is likely to be descriptive or suggestive of an essential attribute of the trademarked good. Moreover, such a word may already be in use as a mark by third parties.

610 F.3d at 1091. The court held that the "significant factor is not whether the word itself is common, but whether the way the word is used in a particular context is unique enough to warrant trademark protection." Id. (citing Wynn Oil Co. v. Thomas, 839 F.2d 1183, 1190 n.4 (6th Cir.1988)). Accordingly, the court found that:

> Use of the word "visa" to refer to travel visas is permissible because it doesn't have [the effect of multiplying meanings of the word]; the word elicits only the standard dictionary definition. Use of the word visa in a trademark to refer to a good or service other than a travel visa, as in this case, undoubtedly does have this effect: the word becomes associated with two products, rather than one. This is true even when use of the word also gestures at the word's dictionary definition.

Id. at 1092.

Thus, Defendant argues that because "twilight" is in the dictionary, "it does not achieve fame for dilution purposes unless it rises to the level of a 'Visa' – a well known term used exclusively as a trademark to describe a product or service offered by its owner." (BB-Mem. at 10.) Plaintiff, on the other hand, argues that its use of the word Twilight "is entitled to even greater protection than VISA ... because TWILIGHT, as used for ... "a vampire-werewolf-teen girl melodrama," is entirely arbitrary or, at least, more arbitrary than VISA, which was found to be famous, distinctive, and entitled to protection against dilution." (Summit-Opp. at 11.)

The Court finds Summit's argument more persuasive. The Visa Intern. court was addressing the defendant's argument that Visa could not protect against dilution, a common word being used in a manner bearing resemblance to its dictionary definition. Here, "Twilight" is neither "descriptive or suggestive of an essential attribute of the trademarked good." Moreover, Visa Intern. does not establish the sort of strict, distinct

requirements that Plaintiff alleges it does; rather, it is merely a factor to be considered in a standard "distinctiveness" analysis.

In fact, in Visa Intern., the court merely re-affirmed the proposition that "[i]n general, the more unique or arbitrary a mark, the more protection a court will afford it," and found that "the word visa wouldn't make people think of credit cards if it weren't for the Visa brand." 610 F.3d at 1090. Similarly, the word "Twilight," although defined in the dictionary, would not make one think of vampire films, let alone teenage romance, if not for the goodwill created by the films and Summit's promotion of them. Id. Vampires have traditionally been depicted as characters of the darkest part of the night who are averse to any kind of light (and garlic, crosses, silver bullets and wooden stakes). In an untold number of movies that have been associated with many different qualities and characteristics, but, until the recent Twilight franchise entered the scene, the notion of "twilight" has not been one of them. But it is now, and in a big way.[3] In short, the mark is arbitrary with respect to the subject matter it was being used to reference, and thus "distinctive" for purposes of a "likelihood of dilution" inquiry.

### c. Substantial Exclusivity

The third factor, "substantial exclusivity," weighs in favor of Summit. As discussed above, BB argues that under Avery and Visa Intern., Summit's dilution claim is precluded because a number of third parties use the Twilight mark. Avery held that "widespread use of 'Avery' and 'Dennison' makes it unlikely that either can be considered a famous mark eligible for the dilution cause of action" because "when 'a mark is in widespread use, it may not be famous for the goods or services of one business.'" 189 F.3d at 878 (citing Trademark Review Commission, Report & Recommendations, 77 Trademark Rep. 375, 455 (Sept.-Oct.1987). Defendant presents

---

[3] As this order is being completed, new outlets are reporting that the latest installment – "The Twilight Saga: Breaking Dawn-Part 1" – generated box office receipts of $139.5 million during its domestic opening. See,e.g.,http://www.cnn.com/SHOWBIZ/2011/11/21/movies/breaking-dawn-box-office-ew/index.html.

1 evidence that "other companies have also registered the word 'Twilight' with the
2 USPTO in connection with clothing and movies."  (BB-Mem. at 14.)

3       Reformulated for the TDRA, BB essentially argues that Summit's use of the
4 Twilight mark was and is not "substantially exclusive" under 15 U.S.C. §
5 1125(c)(2)(B)(iii).  Summit responds on a number of grounds, namely that case law has
6 held that "a limited amount of third party use is insufficient to defeat a showing of
7 substantially exclusive use"; that the evidence of third-party registrations and website
8 printouts presented by BB are either inadmissible or irrelevant; and that BB has
9 presented no evidence of third-party use of the stylized Twilight mark.  (Summit-Opp.
10 at 13-17.)

11       As Summit argues, the standard is not nearly as strict as BB suggests.  Although
12 BB has presented some evidence of a cancelled third-party registration and points to
13 spare goods being sold with the "Twilight" designation, it has presented no evidence
14 that Summit's sale of goods under the "Twilight" mark is not "substantially exclusive."
15 See L.D. Kichler Co. v. Davoil Inc., 192 F.3d 1349, 1352 (Fed. Cir. 1999) ("The district
16 court, therefore, erred in suggesting that any use by others is sufficient to preclude an
17 applicant's declaration of "substantially exclusive" use."); Century 21 Real Estate LLC
18 v. Century Ins. Group, Docket No. 03-0053, 2007 WL 484555, at *16-17 (D. Ariz.
19 2007) (Although the evidence overwhelmingly demonstrates that [Century 21] does not
20 engage in exclusive use of the term "Century" ... there is no genuine dispute that
21 [Century 21] engages in substantially exclusive use of the mark 'Century 21.'").
22 Moreover, as Summit argues in its opposition, neither party contests that Summit's use
23 of the stylized Twilight mark is entirely exclusive.

24                    ***d. Degree of Recognition***

25       As to the fourth factor – the degree of recognition of the mark – BB relies solely
26 on its advertising and sales figures, rather than submitting survey evidence.  However,
27 the Ninth Circuit recently held in Visa Intern. that:

28

1
2
3
4

> a plaintiff seeking to establish a likelihood of dilution is not required to go to the expense of producing expert testimony or market surveys; it may rely entirely on the characteristics of the marks at issue. Expert testimony and survey evidence may be necessary in marginal cases, or where a defendant introduces significant evidence to show that dilution is unlikely. But [the defendant] presented nothing, other than Orr's statement that he did not intend to dilute the Visa mark, to rebut the inference of likely dilution created by the strength and similarity of the marks.

5

610 F.3d at 1092. (citations omitted).

6
7
8
9
10

This factor weighs in Summit's favor as well.  The marks are, as discussed above, identical.  Moreover, although the mark's popularity is of relatively brief duration, the volume of sales of goods and services has quickly topped $1 billion, which is strong circumstantial evidence of the mark's geographic reach and degree of recognition.

11

### e.  Intent to Create Association

12
13
14
15
16
17
18

The fifth factor, intent to create an association with the famous mark, also weighs in favor of Summit.  There is no doubt that BB intended to do as much.  BB continuously alleges that it did not intend to "associate" their jackets with Summit and Twilight, but rather to "inform consumers that the jackets were the authentic jackets actually used in Twilight."  (SUF ¶ 48.)  It is hard to see the difference for purposes of this inquiry.  Moreover, Greg Garrett, former president of BB, testified that hangtags are used to increase customer awareness and improve sales.  (Id. ¶ 51).

19

### f.  Actual Association

20
21
22
23
24
25
26
27
28

Finally, the sixth factor – actual association – also weighs in favor of Summit.  Again, BB has presented no survey evidence of recognition, but given BB's intent to create an association between the jacket and the Twilight films, Yvonne King's admission that Metropark used the image on its website to do just that, and the fact that both Metropark and ModCloth were under the impression that Summit had licensed BB the right to use the Bella image and Twilight marks (Id. ¶ 101), it is clear that some level of actual association did occur.  (King Depo. at 102:2-5.)  See Jada Toys, 518 F.3d at 635-636 (survey evidence demonstrating "actual association" between the

alleged diluting mark and the famous mark "sufficient to meet the heightened standard of <u>actual dilution</u>.")

### 4. CONCLUSION

As all six "likelihood of dilution" factors weigh in favor of Summit, the Court finds that Summit has established this element beyond any genuine issue of material fact. However, the Court finds on the basis of the record before it that fact issues exist as to the "fame" of the Twilight marks for purposes of a dilution claim. Accordingly, although the Court concludes that the likelihood of dilution element is established if the case proceeds to trial, the parties' motions for summary judgment as to Summit's trademark dilution claim are **DENIED** because genuine issues of fact remain as to the "famousness" factor.

### C. SUMMIT'S CLAIM OF COPYRIGHT INFRINGEMENT

Plaintiff's fourth cause of action, for copyright infringement, arises under 17 U.S.C. § 106. That provision grants "the owner of copyright under this title ... exclusive rights to do and to authorize," among other things, (1) the reproduction of the "copyrighted work in copies or phonorecords"; (2) preparation of "derivative works based upon the copyrighted work"; and (3) distribution "of copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(1), (2), (3). "To prevail on [a] copyright infringement claim, [a plaintiff] must demonstrate (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." <u>Benay v. Warner Bros. Entertainment, Inc.</u>, 607 F.3d 620, 624 (9th Cir. 2010) (quotations omitted) (citing <u>Funky Films, Inc. v. Time Warner Entm't Co.</u>, 462 F.3d 1072, 1076 (9th Cir.2006)).

Summit alleges that the it "is the copyright owner of the Bella Image, and all other artwork and copyrighted material associated with the Twilight Motion Pictures" (Compl. ¶ 52); that "Defendants have violated Summit's exclusive rights in and to the Bella Image by unlawfully using, reproducing, and distributing the Bella Image on hangtags, on their Websites, and in other promotional activities" (<u>Id.</u> ¶ 54); and that

31

"[Defendants'] use of the Bella Image was and continues to be well outside the scope of the limited permission granted it by Summit."  (Id. ¶ 55.)

It is undisputed both that Summit owns the Bella image and that BB copied and caused to be copied by its business partners the Bella image for use on hangtags, in e-mail "blasts," and on various websites.  (2d. Summit-Mem. at 14; SUF ¶¶ 12, 43, 69, 70.)  Accordingly, the parties' argument is restricted to three potential excuses for BB's copying of the Bella image: (1) whether BB's use of the Bella image constituted fair use under the Ninth Circuit's four-factor test; (2) whether Summit consented to BB's use of the Bella image in the e-mails between Klein and Boury; and (3) whether Summit is equitably estopped from claiming infringement because several months elapsed between the time that it sent cease and desist letters to BB's retailer partners and the time that it sued BB.  Because all three issues are readily resolvable in Summit's favor, the Court **GRANTS** Summit's motion for summary judgment as to its copyright infringement cause of action.

### 1. FAIR USE

17 U.S.C. § 107 provides that "the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright."  It then sets out a four-factor test for courts to use in "determining whether the use made of a work in any particular case is a fair use":

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.  See, e.g., Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc., 109 F.3d 1394 (9th Cir. 1997) ("The four fair use factors are to be ... weighed together, in light of the objectives of copyright to promote the progress of science and the useful arts.") (citing H.R. Rep. No. 94–1476, 94th Cong., 2d Sess. 65 (1976)).

As Summit argues, BB is precluded from even making a fair use defense here because the Ninth Circuit has held that "[w]holesale copying of copyrighted material precludes application of the fair use doctrine." Marcus v. Rowley, 695 F.2d 1171, 1176 (9th Cir. 1983).  BB attempts to escape that seemingly firm rule by citing to Kelly v. Arriba Soft Corp., a Ninth Circuit case in which a search engine maintained a fair use defense despite taking a photographer's copyrighted images and "display[ing] them in miniaturized, thumbnail form" on its website.  336 F.3d 811, 817-819 (9th Cir. 2003). BB describes in detail the Ninth Circuit's reasoning and suggests that "[t]he hangtags of the Bella Image are brick and mortar analogs to internet thumbnails," as they "are much smaller than the movie posters using the Bella Image, and difficult to view clearly." (2d. BB-Opp. at 6.)  It then seeks to fit its use of the Bella image into the fair use analysis, drawing parallels to Kelly: (1) the image was being "used commercially," but was not being "sold for profit"; (2) rather than serving the "aesthetic function" of promoting the Twilight movies, the hangtag's Bella image was "inform[ing] customers that Defendant's jacket was the same jacket as the one worn by Bella Swan in the movie"; (3) the entire image was copied, but only because "use of the entire image [was] necessary" to convey that message; and (4) "there is no evidence that BB Dakota's use will have any effect on the potential market or value of the copyrighted work."  (Id. at 6-8.)

BB's interpretation of Kelly, and of fair use doctrine more generally, is extraordinarily wooden – at best.  Even if a standard fair use analysis was required, BB's fair use defense fails easily.  First, its use of the image was clearly commercial, regardless of whether the actual image was itself being sold.  Unlike in Kelly, the Bella image is promotional artwork developed to market the motion picture, which BB

33

misappropriated to serve precisely the same purpose in the sale of its garments. Moreover, in <u>Kelly</u>, the transformative use provided a public service, whereas here the artwork was used purely for private gain.  Second, the image itself was not necessary to "inform customers that Defendant's jacket was the same jacket as the one worn ... in the movie," as BB impliedly admits in its reliance on the "As seen in the Twilight movie" language.  Third, use of the <u>entire</u> image was in no way necessary to conveying the message BB alleges it intended to send consumers.  Fourth, and finally, BB has clearly benefitted commercially from its use of the Bella image, deriving profits a significant portion of which would have gone to Summit had proper licensing agreements been in place.

Thus, regardless of whether the standard analysis is employed, BB cannot establish that its use of the Bella image constituted fair use.

### 2. CONSENT

The factual issue most hotly contested by the parties is whether or not the brief e-mail exchange between Klein and Boury gave BB consent to use the Bella image. The content of the e-mail exchange, taken together with the various admissions made by BB's agents in deposition testimony, readily establishes that BB did not have Summit's consent to use the image.

The evidence relating to the e-mails is set forth in full above.  As described there, Klein told Boury that she wanted to "highlight the jacket on our web site along with the image from the movie," and asked for permission to "use the enclosed image," referencing a link included at the bottom of the e-mail.  (Klein/Boury E-Mail.)  Boury responded, "ok."  (<u>Id.</u>)  The only other communication between the two was a followup e-mail in which Klein asked if it was possible for "Metropark to use the image" as well, to which Boury responded "sure."  (<u>Id.</u>)

BB's sole argument here is that Klein's use of a hyperlink to refer to the EW image in her e-mail resulted in some ambiguity as to which image was being referenced. This contention is flawed for a number of reasons.  First, the e-mail explicitly refers to

"the image from the movie," and then links to the EW website.  Second, Klein herself admits that she was seeking, and later believed she had received permission to use only the EW image, and only on BB's website.  (SUF ¶ 52; Klein Depo. at 77:13-21.)  Moreover, the ongoing dialogue between Klein, Brandes and Garrett confirm that Klein continued to believe – and to tell Brandes and other senior executives – that BB did not have consent to use the Bella image.  Thus, even charitably interpreted, Brandes' mistaken understanding of the law was the only reason that further permission was not sought.  (Id. ¶ 53; Klein Depo. at 84:23-87:15, 91:3-25.)  Less charitably, the record indicates that BB has concocted an after-the-fact argument to create an ambiguity that none of the parties recognized when the misappropriation took place.  BB offers no authority that in these circumstances it can manufacture an issue of fact for trial.  BB simply chose to ignore the warnings of its own representatives and now faces the consequences of that decision.

Precedent supports the Court's conclusion.  The Ninth Circuit has held that "[t]he clearest language is necessary to divest the author of the fruits of his labor" – that, as Summit writes, "[r]ights not expressly granted must be construed to be reserved by Summit."  Warner Bros. Pictures, Inc. v. Columbia Broadcasting System, Inc., 216 F.2d 945, 949 (9th Cir. 1954).  See also S.O.S., Inc. v. Payday, Inc., 886 F.3d 1081, 1088 (9th Cir. 1989) ("[C]opyright licenses are assumed to prohibit any use not authorized.")  In other words, licenses to use intellectual property are complex, and casual language in an email exchange cannot so readily be construed to implicitly grant rights not clearly stated within.  Here there was no misunderstanding: Summit never manifested any intent to grant a broad license to BB to use Summit's intellectual property and it was understood as such by BB's own agents.  But even if that e-mail exchange was not clear, precedent teaches that it cannot be construed to implicitly grant BB the right to use the copyrighted Bella image.

### 3. EQUITABLE ESTOPPEL

Finally, BB argues that Summit is equitably estopped from asserting a copyright infringement cause of action because it did not pursue its claim "for nearly a year after it was notified of BB Dakota's jacket promotions and the use of the Bella Image." (2d. BB-Opp. at 12.)

"Copyright estoppel applies when the alleged infringer can show that (1) the copyright owner knew the facts of the infringement, (2) the copyright owner intended its conduct to be acted upon or the copyright owner acted such that the alleged infringer has a right to believe it was so intended, (3) the alleged infringer is ignorant of the true facts, and (4) the alleged infringer relies on the copyright owner's conduct to his detriment." HGI Associates, Inc. v. Wetmore Printing Co., 427 F.3d 867, 875 (11th Cir. 2005) (citing Hampton v. Paramount Pictures Corp., 279 F.2d 100, 104 (9th Cir.1960)).

The record readily demonstrates that BB cannot establish an estoppel defense. BB has presented no evidence that Summit's knowledge of Metropark's infringing actions constituted knowledge of BB's extensive involvement in laying the groundwork for such infringement. Moreover, there is no evidence that BB was "ignorant of the true facts." To the contrary, BB had knowledge of all relevant facts, as evidenced by Klein's repeated communications with Brandes and Garrett, and very well may have infringed on Summit's copyrighted imagery willfully. Finally, there is no evidence that Summit intended for BB to rely on its "conduct," by which BB appears to mean sending cease and desist letters only to retailers, and not contacting BB until 2010. In short, BB seeks to impose a duty upon property owners like Summit to "follow[] up on how its licensed image was being used," by which it means not only that Summit must send a cease a desist letter to Metropark – which it did – but also immediately discern who is responsible for the infringement and sue them. The doctrine of equitable estoppel does not impose such a requirement.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 4. CONCLUSION

Summit's claim of copyright infringement is established by the undisputed facts. BB admits to using the Bella image, which Summit owns a valid copyright in.  None of BB's defenses raise a triable issue of fact.  Accordingly, the Court **GRANTS** Summit's motion for summary judgment as to its copyright infringement cause of action.

### D. BB DAKOTA'S COUNTER-CLAIMS FOR TRADE DRESS INFRINGEMENT AND UNFAIR COMPETITION

Finally, Summit moves for summary judgment on BB's counter-claims for trade dress infringement and unfair competition.  BB alleges that it "is the owner of all rights in the design of its Nicola jacket," which "features a combination of various characteristics constituting a distinctive trade dress" (Docket No. 12, Ans. ¶ 8); that "[b]y virtue of [BB's] extensive sales and promotion of its Nicola jacket over several years, [BB's] Trade Dress has developed secondary meaning in the marketplace" such that "[c]onsumers now recognize [BB] as the source of origin of the Nicola jacket" (Id. ¶ 9); that "Summit has infringed [BB's] Trade Dress in interstate commerce by using, or licensing others to use, images of Bella wearing [BB's] Nicola jacket in advertising and promotional materials for the Twilight movie and its sequels" (Id. ¶ 12); and that "Summit's unauthorized use of [BB's] Trade Dress is intended to trade upon the goodwill and substantial recognition associated with [BB's] Nicola jacket."  (Id. ¶ 13.)

To establish infringement of a trade dress under 15 U.S.C § 1125, "a plaintiff must show that its trade dress is protectable and that defendant's use of the same or similar trade dress is likely to confuse consumers."  Mattel, Inc. v. Walking Mountain Productions, 353 F.3d 792, 808 (9th Cir. 2003) (quotation marks omitted).  "A trade dress is protectable if it is 'nonfunctional and has acquired secondary meaning and if its imitation creates a likelihood of consumer confusion.'"  Id.  Claims of trade dress infringement and unfair competition are subject to the same legal analysis.  See Jada Toys, Inc., 518 F.3d at 628.

37

Among the numerous reasons for which BB's claim fails, the most intuitive is also clearest in the law.  Common sense dictates that BB cannot sue Summit for appropriating or trading off that which Summit has <u>created</u>.  This proposition is reflected in the case law holding that secondary meaning – a necessary element of a trade dress claim – must exist <u>prior</u> to the defendant's use of the alleged trade dress.  Indeed, as Summit points out, the Ninth Circuit has made this point on a number of occasions.  In <u>Levi Strauss & Co.</u>, the Ninth Circuit made this point explicitly: "[Plaintiff] was required to prove that the tab as used on shirts had acquired secondary meaning by 1976, when [Defendant] began using a protruding label on shirts."  778 F.2d 1352, 1358.  <u>See also</u> <u>Continental Lab. Prods., Inc. v. Medax Int'l, Inc.</u>, 114 F. Supp.2d 992, 1000 (S.D. Cal. 2000) ("Plaintiff bears the burden of showing its mark or design obtained secondary meaning before the defendant commenced its allegedly infringing activities."); <u>Braun, Inc. v. Dynamics Corp of Am.</u>, 975 F.2d 815, 826 (Fed. Cir. 1992) ("A claim of trade dress infringement fails if secondary meaning did not exist before the infringement began.").  BB seeks to distinguish these cases, arguing that:

> The public does not associate a movie maker as the source of clothing shown in its movies. When the public saw BB Dakota's jacket in Summit's movie, they did not associate the jacket with Summit; they associated it with the maker of the jacket. Far from creating the impression of two, unrelated companies using the same trade dress, Summit's use served to create secondary meaning <u>for BB Dakota</u>.

(1st BB-Opp. at 13.)  BB suggests that the Twilight films simultaneously created secondary" meaning" in the Jacket – which somehow accrued to BB Dakota – and traded or infringed on that secondary meaning.  No support is provided for such an unusual argument, and as a logical matter, the Court finds it unpersuasive.  BB <u>discontinued</u> the jacket prior to its use in the "Twilight" film (SUF ¶ 24), and acknowledges that the jacket achieved the required "secondary meaning," if at all, through its use in the film – the allegedly infringing action.

Moreover, to the extent that BB seeks to base this claim on Summit's subsequent use of the trade dress on action figures and the like, BB's own argument,

quoted above, is instructive.  In assessing secondary meaning, the Ninth Circuit considers, in part, "(1) whether actual purchase[r]s of the product bearing the claimed trademark associate the trademark with the producer."  <u>Levi Strauss & Co. v. Blue Bell, Inc.</u>, 778 F.2d at 1352, 1358 (9th Cir. 1985).  It is clear therefore that secondary meaning entails the association of a mark with a <u>particular</u> producer.  Despite asserting otherwise, BB has produced no evidence that <u>Summit</u>'s use of the trade dress created secondary meaning for <u>BB</u>.  Indeed, BB's persistent attempts to associate the Jacket with Summit's mark belies any such contention.

This flaw in BB's claim is both irremediable and fatal.  Accordingly, it cannot establish a claim of trade dress infringement in light of the undisputed facts, and the Court **GRANTS** Summit's motion for summary judgment on BB's counter-claims.

### V.

### CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS in part** and **DENIES in part** Summit's motion for summary judgment on liability; **GRANTS** Summit's motion for summary judgment on BB Dakota's counter-claims; and **DENIES** BB Dakota's motion for summary judgment on Summit's trademark dilution claim.  However, with respect to the trademark dilution claim, the Court finds that Summit has established a likelihood of dilution and that such finding eliminates the need for a trial on that element if the dilution claim proceeds to trial.

**IT IS SO ORDERED.**

Dated: November 21, 2011

_____
Gary Allen Feess
United States District Judge